IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-02409-CNS-NRN

MOISES ALBINES,

     Plaintiff,

v.

HOTELENGINE, INC,

     Defendant.

---

**ORDER ON MOTION TO GRANT COURT-AUTHORIZED NOTICE PURSUANT TO
216(b) OF THE FAIR LABOR STANDARDS ACT (ECF No. 52)**

---

**N. Reid Neureiter**
**United States Magistrate Judge**

     This matter is before the Court on Plaintiff Moises Albine's Motion for Court-Authorized Notice Pursuant to Section 216(b) of the Fair Labor Standards Act (the "Motion"), filed August 26, 2025. ECF No. 52. Defendant Hotel Engine, Inc. d/b/a Engine ("Defendant" or "Engine") filed a response on September 30, 2025. ECF No. 61. Plaintiff filed a reply on October 14, 2025. ECF No. 66. The Court heard argument on November 3, 2025. Having considered the submissions and the arguments of the Parties, the Court **GRANTS** Plaintiff's Motion and **APPROVES** the proposed Notice as described below.

## I.   Factual Background

     Engine is a travel technology company offering businesses a platform to book business travel, manage reimbursements, and monitor spending in one place, and offering a marketplace where hotels, airlines, and car rental companies can gain

bookings from customers. Engine takes a percentage of each booking as its "fee" for use of its platform. ECF No. 68 at 1–2.

Plaintiff is a resident of Winter Garden, Florida. From approximately August 2022 to approximately February 2023, Plaintiff worked for Engine in Florida, remotely, as an Account Manager, part of Engine's sale force. ECF No. 68 at 3. He says he regularly worked for more than 40 hours in a workweek but was not paid for the overtime hours worked. For example, he asserts that during the week of November 14, 2022, he worked approximately ten overtime hours without compensation. *Id.*

Plaintiff has brought this lawsuit to recover unpaid overtime compensation and other damages for himself and other similarly situated individuals who worked for Engine as exempt-classified Account Executives, Account Managers, Sales Associates, and other similar positions—variously titled throughout the Amended Complaint as "Sales Employees." ECF No. 68 at 1. In Plaintiff's Motion, employees working in these sales roles are referred to as "Sales Representatives." ECF No. 52 at 1 n.1.

Plaintiff alleges Engine employs these Sales Employees or Sales Representatives to attract hotels, airlines, and car rental companies to its marketplace and to sell its booking management platform to business clients for business travel needs. Engine hires Sales Representatives to focus on different parts of the sales cycle. Some Sales Representatives focus on bringing new hotels, airlines, and car rental companies onto the platform, whereas others focus on finding new businesses to book through Engine's booking management platform. *Id.* at 2.

Plaintiff alleges that despite focusing on different parts of the sales cycle, Sales Representatives perform, as their primary job duty, a similar mix of sales-related tasks.

Sales Associates focus on attracting hotels, airlines, and rental car companies to
Engine's platform by prospecting for, and cold calling, leads. They pitch participation in
Engine's platform to these leads and sell subscription advertising and marketing
products. Account Executives focus on selling the booking management platform to
businesses to use for their business travel needs, by managing the full sales cycle, from
prospecting to close. They prospect for potential customers, cold call those businesses,
and pitch the platform to them. Account Executives then focus on increasing bookings
over the client's first year on the platform by collaborating with Engine's Account
Management team to foster growth in existing accounts. Account Managers carry out
the last part of the sales cycle: proactively identifying new revenue opportunities by
hunting within the existing account base to generate business and consistently exceed
quota. *Id.* at 7–8.

Plaintiff alleges that regardless of specific role, Sales Representatives primarily
perform their sales duties from the Colorado office or remotely from their homes and
rarely (if ever) meet in-person with potential customers. *Id.*

Plaintiff alleges that Engine set sales quotas and productivity metrics for its Sales
Employees to meet. ECF No. 68 at 7. Engine fostered a competitive environment,
encouraging its Sales Employees to work long hours to hit sales metrics and earn
commissions and incentive pay. Engine is permeated by a "hustle" and "grow or die"
culture. The Chief Executive Officer and Founder describes the culture as "intense."
Engine frequently changed Plaintiff's and other Sales Employees' commission and
incentive pay structures and increased Plaintiff's and other Sales Employees' quotas,
which further encouraged Sales Employees to work more hours to exceed their quotas

and ensure that they would satisfy any change in the pay structure. *Id*. Plaintiff claims that based on these policies and incentives, Sales Employees at Engine regularly worked overtime hours to meet Engine's job requirements, communicate with customers, and meet sales quotas and productivity metrics set by Engine. *Id*. Thus, Plaintiff alleges that Engine had and has a policy and pattern or practice of requiring Plaintiff and similarly situated Sales Employees to work in excess of 40 hours per workweek, without overtime compensation, and as part of its regular business practice, Engine has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy that violates the FLSA. *Id*. at 8. It is alleged that Engine's policy and pattern or practice includes, among other things, willfully misclassifying Plaintiff and similarly situated Sales Employees as exempt from the protections of federal overtime laws, willfully failing to record all of the time that its employees worked for the benefit of Engine, willfully failing to keep payroll records as required by the FLSA, and willfully failing to pay its employees overtime wages for all of the overtime hours that they worked. *Id*.

Plaintiff has submitted a sworn declaration in support of the Motion. *See* ECF No. 52-2. In that declaration, Plaintiff explains that as an Account Manager, his primary duty was sales-related work, including performing routine customer service, retaining existing client business, and convincing existing clients to increase bookings through the platform or to book exclusively through Engine. *Id*. ¶ 2. He performed his work over Zoom, the phone, and computer, and never met clients face-to-face. On beginning employment with Engine, he participated in an orientation and training program that lasted approximately two and a half weeks. During this period, the instructors provided

training to Plaintiff, as well as to other Account Managers and Strategic Account

Managers, on the use of Engine's software systems, prospecting methods, sales

techniques, and the products and services that they would be responsible for selling to

customers, in accordance with company standards. Plaintiff completed this training

alongside other Account Managers who began their employment at the same time. *Id*. ¶

4.

Engine provided Plaintiff with "battle cards"—documents that explained how

Engine's platform was better than other booking management platforms—and scripts

with sample questions to ask customers that could lead to conversations where Plaintiff

would recommend to customers that they increase usage of Engine's platforms. *Id*. ¶ 5.

Per Plaintiff's declaration, he was required to meet certain metrics, such as a "churn

rate" of new business booked through his book of business compared against the

percentage of business that did not rebook or left the platform. He was also required to

contact every customer in his book of business at least once per month and provide

each customer will an annual recommendation of how they could increase usage of the

Engine booking platform. Engine changed Plaintiff's sales metrics frequently throughout

Plaintiff's employment. *Id*. ¶ 6.

Plaintiff was paid a base salary of $55,000 to $60,000 and was eligible to earn

commissions, which were based on the percentage of new bookings compared with the

percentage of bookings that left the platform from his book of business. *Id*. ¶ 9.

Plaintiff's understanding was that he was classified exempt from overtime, and he

received no overtime pay for the overtime hours that he worked. *Id*. ¶ 10.

In fact, Plaintiff regularly worked more than 40 hours a week. Working more than 40 hours a week was a routine and necessary part of the sales jobs at Engine. The corporate "DNA" and messaging from the executives was "hustle" and "grow or die." To hit quota and avoid being among the lowest performing Account Managers, Plaintiff had to work more than 40 hours per week. *Id*. ¶ 11.

Based on his observations and conversations with others, Plaintiff claims that other Account Managers and Account Executives performed a similar range of duties and were subject to comparable compensation policies. He knows this because he worked directly alongside them, observed the nature of their work, and communicated with them frequently through the Slack application. To the best of Plaintiff's knowledge, other Account Managers and Account Executives were also assigned similar performance metrics and quotas. Additionally, the Account Managers and Account Executives with whom he worked routinely worked in excess of 40 hours per week. He knows this because he personally discussed work hours with certain Account Managers and Account Executives, including conversations that extended into the evening, past 7:00 p.m. EST. Furthermore, it was common for Account Managers to perform duties on scheduled days off and some weekends. These duties included responding to clients via text message, calling hotels to ensure successful check-ins, and coordinating with Engine staff to resolve customer issues. *Id*. ¶ 13.

Beyond his own affidavit, Plaintiff has submitted a number of other declarations of Sales Employees or Representatives in support of the motion. These declarations are generally consistent with Plaintiff's declaration in confirming that Engine provided all the Sales Employees with a set script outlining the Engine sales pitch; that Engine requires

Sales Employees to meet certain metrics; that Engine required Sales Employees to use common computer systems, tools, and sales techniques; that most Sales Employees were hired at a base salary and were eligible to earn commissions; that Sales Employees were classified as exempt from overtime and received no overtime pay for the overtime hours worked; and that these Sales Employees regularly worked more than 40 hours a week to complete all of their assigned tasks. *See, e.g.,* ECF No. 52-3 (Decl. of Tyler Kelly—Engine Mid-Market Account Executive from July 2023 to March 2024); ECF No. 52-4 (Dec. of Kevin Thonkulpitak—Engine Senior Account Executive from June 2023 to June 2024); ECF No. 52-5 (Decl. of Grant Southwick—Engine Account Executive from January 2022 until November 2024); ECF No. 52-6 (Decl. of Shane Figueroa—Engine Account Executive, Inside Sales, National Account Executive, and Senior Account Executive, from February 2020 to May 2024); ECF No. 52-7 (Decl. of Jordan Harrison—Engine Sales Associate from January 2023 to August 2023); ECF No. 52-8 (Decl. of Jennifer Smith—Engine Account Manager from May 2022 to January 2023) (swearing that Engine "created a culture of fear that sales employees were never going to hit their metrics or to avoid termination").

## II.   Plaintiff's Motion for Court-Authorized Notice

The Fair Labor Standards Act ("FLSA") provides a private cause of action against employers who violate its provisions and enables an employee to sue "for and in behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). It further specifies that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* In other words, unlike a Rule 23 class action, all

plaintiff employees in an FLSA collective action must "opt-in" to the litigation in order to be allowed to assert their own individual FLSA claims. In *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989), the Supreme Court granted courts the discretion to oversee the process by which collective action plaintiffs give notice of the litigation to their similarly-situated co-workers, allowing the co-workers the opportunity to then opt into the existing litigation. Court supervision of the process of notifying affected employees and soliciting opt-in notices ensures that information received by employees about the suit is "timely, accurate, and informative," prevents "a multiplicity of duplicative suits," and enables the setting of deadlines for the submission of opt-in notices so as to "expedite disposition of the action." *Id*. at 172.

As in this case, the question of who (if anyone) should receive a *Hoffmann-LaRoche* notice is often the subject of some dispute. The touchstone of that inquiry is the FLSA's collective action provision, which allows "other employees similarly situated" to a named plaintiff to opt in to the named plaintiff's existing suit. 29 U.S.C. § 216(b).

The "'near universal practice' of the district courts[ ] comes from the 1987 New Jersey district court opinion in *Lusardi v. Xerox Corporation*," which "laid out a two-step process to determine, 'on an ad hoc case-by-case basis,' whether prospective opt-in plaintiffs in a proposed collective are 'similarly situated' enough to satisfy the FLSA." *Swarles v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 436 (5th Cir. 2021) (*citing Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987; and *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). Step one involves "'an initial 'notice stage' determination that proposed members of a collective are similar enough to receive notice of a pending action." *Id*. District courts at this stage "base their decisions on the

pleadings and affidavits of the parties" and "may require little more than substantial allegations that the putative collective members were together the victims of a single decision, policy, or plan." *Id*. (internal quotation marks omitted). Step two occurs at the conclusion of discovery, when the court decides, based on evidence produced in discovery, whether the plaintiffs are "similarly situated" based on "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Id*.

This standard and process has been adopted by the judges of this District. For example, in *Turner v. Chipotle Mexican Grill, Inc.*, 123 F. Supp. 3d 1300, 1309 (D. Colo. 2015), Judge John L. Kane concluded that the court should "presumptively allow workers bringing the same statutory claim against the same employer to join as a collective," deferring questions of substantial similarity to a later date, just as *Thiessen* did. Thus, *Turner* approved of issuance of a *Hoffman-LaRoche* notice to "all current and former non-exempt hourly workers employed by Chipotle" where the allegations were that managers routinely required employees to engage in off-the-clock work. *Id*. at 1301–02, 1309.

Cases like *Thiessen* and *Turner* posit relatively lenient standards governing similarity for purposes of authorizing *Hoffmann-LaRoche* notices. *See also Perez v. Denco Construction LLC*, Civ. No. 24-cv-02766-RMR-NRN, 2025 WL 2639210, at *2 (D. Colo. Sept. 12, 2025) (approving conditional certification of collective of construction workers who allegedly were not paid overtime and calling standard for conditional certification "a lenient one"). But lenience does not mean a rubber stamp. There must

be some prima facie indication that the FLSA violations the plaintiff complains of are indeed occurring at the degree and scale the plaintiff alleges, "lest an individualized pay grievance metastasize to a nationwide litigation based only on the strength of the plaintiff's say-so." *Quint v. Vail Resorts, Inc.*, No. 20-cv-03569-DDD-GPG, 2022 WL 17976798, at 7 (D. Colo. Nov. 22, 2022) r*ecommendation accepted in part and rejected in part on other grounds*, 2023 WL 5564724 (D. Colo. July 11, 2023), and *objections overruled*, 2023 WL 9060872 (D. Colo. Nov. 22, 2023).

The now-familiar "plausibility" standards of Fed. R. Civ. P. 12(b)(6), as articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 677–84 (2009), are a fair burden to measure a plaintiff's claims against. The scope of the *Hoffmann-LaRoche* notice must be limited to those similarly-situated individuals whose potential FLSA injuries are plausibly alleged in the complaint or in other evidence in the record.

To make that determination, the Court examines the record, discarding allegations that are "mere labels and conclusions" and "formulaic recitation of the elements of a cause of action," instead looking for "sufficient factual matter [that,] accepted as true, . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bledsoe v. Carreno*, 53 F.4th 589, 607 (10th Cir. 2022) (citing *Iqbal*, 556 U.S. at 678); *see also Quint,* 2022 WL 17976798, at *7. Courts in this circuit regularly authorize notice based on the pleadings coupled with a small number of declarations. *See, e.g., Lechot v. Powerstroke Well Control, Inc.,* No. 19-cv-02315-DDD-STV, 2020 WL 10818364, at *3 (D. Colo. Mar. 9, 2020) (authorizing notice based on complaint and one declaration); *Kovacs v. G4S Secure Sols. (USA) Inc.*, No. 20-cv-3180-RMR-KMT, 2022 WL 1402097, at *2 (D. Colo. Jan. 18, 2022)

(complaint and three declarations); *Lysyj v. Milner Distrib. All., Inc.*, No. 13-cv-01930-RM-MJW, 2014 WL 273214, at *3 (D. Colo. Jan. 24, 2014) (complaint and one declaration).

In deciding whether to conditionally certify and send out the notice, "the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Bradford v. Logan's Roadhouse, Inc.*, 137 F. Supp. 3d 1064, 1072 (M.D. Tenn. 2015) (citation and internal quotation marks omitted). Courts deny conditional certification in instances where the complaint is wholly conclusory in nature, the supporting affidavit relies on hearsay from unidentified sources, or the nature of the violation is rendered ambiguous by the particular circumstances of the only named plaintiff. *See, e.g., Saarela v. Union Colony Protective Servs., Inc.*, No. 13-cv-01637-MSK-MJW, 2014 WL 3408771, at 2–4 (D. Colo. July 14, 2014) (dismissing motion for conditional certification without prejudice and instructing the plaintiff he could renew his request upon a more substantial showing that the defendant company's alleged failure to pay overtime to plaintiff was indicative of a policy that applied equally to other similarly-situated employees). The standard for conditional certification has been described as a "minimal burden," *see Lsysyj v. Milner Distrib. Alliance, Inc.*, No. 13-cv-01930-RM-MJW, 2014 WL 273214 (D. Colo. Jan. 24, 2014), and its application "typically results in class certification." *Brown v. Money Tree*, 222 F.R.D. 676, 679 (D. Kan. 2004); *see also Stallings v. Antero Resources Corp.*, No. 17-cv-01939-RM-NYW, 2018 WL 1250610, at *3 (D. Colo. March 12, 2018).

Plaintiff argues that he has met the modest factual threshold showing needed to justify the sending of the notice. Allegations in the Amended Complaint are supported

with declarations of eight former Sales Representatives detailing consistent experiences at Engine, regardless of location, as well as Engine's own corporate documents, including job postings, offer letters, and a handbook and culture memo. Plaintiff argues that this evidence shows that Engine's Sales Representatives are paid in a similar fashion (salary plus commissions), are uniformly classified as exempt, and have the same primary job duties. ECF No. 52 at 16. In terms of whether the Sales Representatives share similar job duties, Plaintiff argues that Engine's uniform job descriptions, coupled with the multiple declarations from Sales Representatives across four states, show that the Sales Representatives are performing the same non-exempt sales duties: selling Engine's booking management platform. *Id.* at 18.

Plaintiff seeks to send the notice to the potential collective via U.S. mail, email, text message, and the LinkedIn messaging service. Plaintiff argues that notice via email, text message, and LinkedIn is appropriate in the instant situation given that the potential collective members are mostly young professionals who use more modern modes of communication than U.S. mail and even regular email alone. Plaintiff further requests that notice be available on a standalone website through which opt-ins can electronically submit the necessary opt-in forms. Plaintiff also asks that a reminder notice be authorized to those who have not returned the opt-in form half-way through the notice period.

Plaintiff seeks a 90-day opt-in period and that notice be authorized to Sales Representatives nationwide who worked for Engine since May 6, 2022, three years before the filing of the complaint. Plaintiff argues that a three-year notice period is appropriate as Engine's violations of the FLSA were willful.

III.    **Engine's Opposition to the Proposed Notice**

Engine objects to the sending of the proposed notice in part because Plaintiff worked as an Account Manager, only, and never worked as an Account Executive or Sales Associate. Engine complains that Plaintiff is seeking conditional certification and a notice to be sent to *all* of Engine's Sales Employees, regardless of their title, the work they performed, where they worked, who they worked under, or the compensation they received. ECF No. 61 at 2. Engine argues that "[u]nder any applicable standard for conditional certification, Plaintiff cannot establish that he is similarly situated to the sales employees he seeks to represent." *Id*. This is because, per Engine, the sales employees' experience at Engine varied drastically based on individual circumstances. None were subject to a single FLSA-violating plan or policy, and each Sales Employee had disparate employment experiences relevant to Engine's exemption defenses. *Id*. Engine argues that these factual differences will necessitate the presentation of individualized evidence as to whether each sales employee was properly classified as exempt and the hours he or she worked. *Id*.

Engine also argues that the Court should use a stricter standard for deciding whether to send out the *Hoffman-La Roche* notice. Engine is fearful that using an "overly permissive" notice standard will allow Plaintiff to artificially expand the size of the collective, thereby increasing the pressure to settle, regardless of the merits of the action. *Id.* at 4. Instead, Engine argues that the Court should adopt a "gatekeeping framework" espoused by the Fifth Circuit, which requires the assessment at the outset as to whether the plaintiffs are *actually* similarly situated. *See id.* at 5–6 (citing *Swales v. KLLM Trans. Servs.*, LLC, 985 F.3d 430, 434 (5th Cir. 2021)).

Engine's primary attack on Plaintiff's request for conditional certification for notice purposes is that the proposed collective consists of a class composed of three separate and discrete roles, two of which Plaintiff did not work in. *See id.* at 7-8. Plaintiff worked only as an Account Manager remotely in Florida. And yet he seeks to represent not only current and former Account Managers but also Account Executives and Sales Associates. Engine argues that these roles are very different and Plaintiff cannot be deemed to be "similarly situated" to Sales Employees who did not share his role.

Engine has submitted the declaration of Jordan Epstein, currently Engine's Vice President of Revenue, who started with the company as an Account Executive. ECF No. 61-2. Epstein oversees all sales roles and functions at Engine, and asserts he is familiar with the duties, responsibilities, and compensation structure of Engine's Account Executives, Account Managers, and Sales Executives. These three job categories are broad classifications of employees that differ in terms of rank, experience, compensation, oversight, and duties and responsibilities. *Id*. ¶¶ 4–5. By example, Epstein states that Account Executives have a distinct commission policy, which is further differentiated by sub-roles in the Account Executive job classification, such as Account Executives, Senior Account Executives, National Account Executives, and Senior National Account Executives. *Id*. ¶ 9. These sub-roles apparently vary in terms of oversight, quotas, incentives, compensation structure, rank, and benefits. For example, there are no performance metrics expectations related to the number of calls placed by National Account Executives and Senior National Account Executives. *Id*. ¶ 10. In addition, many Account Executives, but not all, earn total annual compensation

inclusive of commissions that exceeds $107,432—which is the standard for a highly compensated employee who may be exempt from overtime rules. *Id*. ¶ 11.

By contrast, Account Managers at Engine focus on onboarding and growing existing accounts assigned to them by the Account Executives. Their role is primarily customer-service focused, with a greater emphasis on relationship management than on direct sales, in contrast to Account Executives and Sales Executives. Account Managers are paid a base salary, starting at $60,000 per year, with exact amounts determined by experience. Account Managers are subject to distinct commission policies and performance metrics, which vary across sub-roles based on seniority— Small Business Account Managers, Mid-Market Account Managers, Enterprise Account Managers, and Strategic Account Managers. *Id*. ¶¶ 12–14. Some Account Managers also earn total annual compensation, inclusive of commissions, that exceeds $107.432. *Id*. ¶ 16.

As compared to Account Executives and Account Managers, Sales Executives are one unified team without different sub-roles and levels. A Sales Executive who meets performance metrics can be promoted to the role of Account Executive. A limited number of Sales Executives make more than $107,432 in annual compensation. *Id*. ¶¶ 18–19.

Epstein states that the three broad categories of "sales" roles are not governed by a uniform compensation or commission policy. Each role has its own distinct compensation structure. *Id*. ¶ 20. Epstein also relates that Engine continually updates and revises its compensation policies, including commission structures, job titles, descriptions and responsibilities. As a result, a Sales Employee from 2022 to 2024 may

have had substantially different sales experience and title compared to a sales employee starting now. *Id*. ¶ 23.

Epstein says that any minimum performance metrics established by Engine "can be reasonably achieved within a standard 40-hour workweek," and, in his experience, "most sales employees do not work over 40 hours each week." *Id*. ¶ 26.

Engine argues that Plaintiff's proposed putative class encompasses hundreds of employees in at least a dozen distinct roles, spread across approximately 30 states, reporting to different supervisors, and subject to varying compensation structures and evaluation systems. All of these different characteristics mean two things. First, it is difficult to conclude that all these differently situated employees were subject to a single policy or practice. Second, in terms of determining whether Engine actually violated the FLSA with respect to these various categories and subcategories of employees, there will need to be an individualized assessment of, for example, whether the employees exceeded the $107,432 compensation threshold for a highly compensated employee, above which overtime need not be paid, *see* 29 C.F.R. § 541.601, or whether other exemptions, such as the administrative exemption,[1] to overtime rules might apply. Engine maintains that the applicability of exemptions will hinge on each sales employee's duties, levels of discretion, and exercise of independent judgment—factors which vary greatly from employee to employee—making conditional certification

---

[1] The administrative exemption applies where the employee's primary duty is (1) "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §541.200; *see also* 29 C.F.R. §541.201(defining work "directly related to management or general business operations").

inappropriate. ECF No. 61 at 14–15 (citing *Jonites v. Exelon Corp*., 522 F.3d 721, 725-26 (7th Cir. 2008)). Engine argues that the proposed collective is "hopelessly heterogeneous" because of the myriad and distinct legal and factual issues, and conditional certification should be denied. *Id.* at 15–16.

Engine also strongly disputes that the proposed collective of employees was subject to a common policy or plan that violated the FLSA. *Id.* at 16–17. Engine says the employees were all properly classified as exempt as either highly-compensated employees or under the administrative exemption, and even if certain employees were entitled to overtime (which Engine denies), many never worked more than 40 hours per week and therefore were not owed overtime compensation in any event. *Id.* Per Engine, conclusory declarations that Sales Employees worked over 40 hours per week, or that Engine's culture encouraged this, do not constitute "substantial allegations" that the Plaintiff or those he seeks to represent were similarly situated or were together the victims of a single FLSA-violating decision, policy, or plan. *Id.* at 17.

Finally, Engine takes issue with the proposed notice and dissemination methods. Engine believes the proposed notice is "overburdensome and unnecessary." Engine also argues that most current employees should be excluded from any collective because they are subject to arbitration agreements with class and collective action waivers. *Id.* at 19.

## IV.  Decision

The Court rejects Engine's invitation to use a more stringent "gate-keeping" approach to determine whether employees are similarly situated for notice purposes. The Court instead applies the accepted general practice of this District that the standard

for conditional certification should be a two-step process and should be "lenient." *See*
*Wilfong v. TTEC Servs. Corp.*, No. 24-cv-01076-CNS-KAS, 2025 WL 580474, at *2 (D.
Colo. Feb. 21, 2025); *Morris v. MPC Holdings, Inc.*, 2021 WL 4124506, at *2 (D. Colo.
Sept. 9, 2021) (rejecting invitation to depart from well-established Tenth Circuit
precedent applying the two-step conditional certification process for the more stringent
approach adopted by the Fifth Circuit in *Swales*).

At the notice stage, a plaintiff must offer "nothing more than substantial
allegations that the putative [collective action] members were together the victims of a
single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102. The Court concludes that
Plaintiff has met the relatively low threshold for conditional certification, and will approve
the sending of the notice to the proposed collective of "all Sales Employees," including
Account Executives, Account Managers, Sales Associates.

The Court finds that Plaintiff, through his First Amended Complaint, his affidavit,
and accompanying supporting documents and numerous other affidavits, has
adequately alleged that he and other Sales Employees were the subject of common
plan or policy. Specifically, it appears from the allegations and affidavits (and is not even
disputed by Engine) that *all* Sales Employees, regardless of title or position, were
deemed to be exempt from the FLSA's overtime requirements and therefore were not
paid overtime when they worked more than 40 hours per week. This may have been
because they were highly compensated or because Engine decided that the
administrative exemption applied to the positions. But the across-the-board declaration
that all Sales Employees were exempt is certainly a company-wide policy. All Sales
Employees shared common job duties of selling Engine's products. They were all paid a

base salary plus commission. All seem to have been subject to an aggressive corporate culture where a failure to achieve certain sales metrics could result in termination, creating an environment where unpaid overtime work would been expected or required to hit sales quotas. The affidavits submitted by Plaintiff and other Sales Employees span at least six job titles or job ranks, across four locations supervised by 16 managers, and indicate that the employees all worked overtime and that their managers knew they were working overtime.

At this first stage, the Court will not consider the various factual arguments raised by Engine in opposing the Motion. *See Perez*, 2025 WL 2639210, at *4 ("The court does not weigh evidence, resolve factual disputes or rule on the merits of plaintiffs' claims during the notice stage.") (citation omitted). Instead, it is appropriate to defer questions relating to disparate factual and employment settings of the individual plaintiffs to the second stage decertification process. *See Thiessen*, 267 F.3d at 1103. There may be some heterogeneity among the proposed collective. There may be some members of the collective who did make enough money to qualify for the highly compensated exemption. But Engine will be able to test those particulars at the second stage, after the collective has been given notice of this lawsuit and given the chance to participate. *See Wilfong*, 2025 WL 580474, at *4 ("[W]hether the opt-in Plaintiffs had different managers and worked on different client contracts is more appropriate for the decertification stage."); *Coldwell v. Ritecorp Env't Prop. Sols.*, No. 16-cv-01998-NYW, 2017 WL 4856861, at *4 (D. Colo. July 20, 2017) ("The Tenth Circuit has cautioned the trial court to avoid focusing on merits of the underlying [collective] action in making [conditional] certification decisions.") (*citing Adamson v. Bowen*, 855 F.2d 668, 676

(10th Cir. 1988)); *Gray v. Delta Cnty. Mem'l Hosp. Dist.*, No. 19-cv-02938-RBJ, 2021
WL 1329263, at *5 (D. Colo. Mar. 1, 2021) ("[T]he precise hours of uncompensated
overtime, go to individual damages and not whether conditional certification is
warranted.").

### V.    The Notice—To Whom It Should Be Sent and its Form.

Having determined that Plaintiff has met the relatively low threshold for
conditional certification to send out the notice, the question becomes to whom the notice
should be sent, what should the notice contain, and the timing.

The Court agrees with the Plaintiff that notice should go to all Sales Employees
nationwide, including in the State of Colorado. Plaintiff's complaint has been amended
to include Colorado-resident employees in the proposed collective.

Similarly, notice should go to all Sales Employees, even where Engine has an
argument that some percentage of those employees may be subject to arbitration
agreements. The issue of arbitration may be raised at the second stage of the
certification analysis. *See Judd v. Keypoint Gov't Sols., Inc.*, No. 18-cv-00327-RM-STV,
2018 WL 7142193, at *6 (D. Colo. Dec. 4, 2018) (explaining that "the better course" is to
provide notice to all potential class members and later determine whether arbitration is
to be compelled); *Beattie v. TTEC Healthcare Sols., Inc.*, No. 18-cv-3098-RM-NRN,
2019 WL 2866559, at *1 (D. Colo. July 3, 2019) (granting conditional certification and
sending notice to all members of the collective, even though some members of the
collective had signed arbitration agreements). The case of *Brayman v. KeyPoint
Government Solutions*, No. 18-cv-0550-WJM-NRN, 2019 WL 3714773 (D. Colo. August
7, 2019), cited by Engine, is distinguishable because in that case there were thousands

of potential opt-in collective members who were subject to arbitration agreements, some had already tried to opt-in, and the defendant had already moved to compel arbitration with respect to the opt-ins who had signed arbitration agreements. So, the Court was able to decide the question of the scope of the notice while simultaneously deciding the arbitration question, concluding that it would not be appropriate to "inform persons subject to the arbitration agreement that they have a right to join a collective action when they have prospectively waived that right." 2018 WL 3714773, at *8. Those circumstances do not apply to the instant case.

The Court also agrees that the notice should reflect the three-year period prior to the filing of the complaint in this case. To the extent that the statute of limitations may bar some of these claims, the issue can be decided later, but at the very least, potential opt-ins should first have an opportunity to receive notice and raise arguments regarding equitable tolling, if appropriate. *See Conejo v. Sellan Structural Erectors, LLC,* No. 23-cv-2930-SKC-STV, 2025 WL 872494, at *2 (Mar. 20, 2025) ("Plaintiffs may distribute the notice to those members of the collective who worked for Defendants within three years prior to the date of the filing of this action."); *German v. Holtzman Enters., Inc.*, No. 19-cv-03540-PAB-STV, 2021 WL 1087718, at *3 (D. Colo. Mar. 22, 2021) ("[S]tatute of limitations arguments are better suited for later stages of the litigation.").

As to the form of notice, the Court approves the revised (redlined) notice submitted with Plaintiff's reply brief with modifications described below, finding that (with the specified modifications) the notice is fair and accurate. The approved form of notice is ECF No. 66-2 (redlined form of notice).

The Court agrees that it is not necessary to include information in the notice itself that Sales Employees could be responsible for paying fees and costs, as it could discourage putative members from joining the litigation and would run contrary to the FLSA's remedial purposes. *See Levine v. Vitamin Cottage Nat. Food Markets Inc.*, No. 20-cv-261-STV, 2020 WL 6546734, at *5 (D. Colo. Nov. 6, 2020) (noting chilling effect of such language); *Abdulina v. Eberls Temp. Servs. Inc.*, No. 14-cv-00314-RM-NYW, 2015 WL 12550929, at *7 (D. Colo. April 27, 2015) (declining to issue similar warning because it would have a chilling effect), *report and recommendation adopted as modified*, 2015 WL 4624251 (D. Colo. Aug. 4, 2015). **However, the notice should include language explaining that potential opt-in members may have discovery obligations and they may contact Plaintiff's counsel if they have questions about those obligations**. *See Levine*, 2020 WL 6546734, at *5.

**The notice should also inform the members of the collective that they may hire their own lawyer if they want.**

The Court also agrees with Plaintiff that modern technological means of disseminating the notice, beyond regular mail and e-mail, such as via text message and LinkedIn, are appropriate under these circumstances, where the potential opt-ins are tech-savvy sales representatives and account managers who apparently used LinkedIn in their work for Engine. *See Conejo*, 2025 WL 872494, at *2 (allowing for e-mail and text message as forms of notice given this "technology-driven age"). Engine complains that "anything more" than regular mail or e-mail is "excessive and unnecessary under the circumstances." ECF No. 61 at 20. But Engine makes no argument that there is any downside to sending out notice via other methods. The only downside that the Court

can perceive of using these additional methods is that more people will learn of their right to seek redress for violations of federal labor law, which is no downside at all. The Court rejects Engine's suggestion that using multiple methods of notice somehow constitutes judicial endorsement of the merits of the claim or a "high pressure campaign to join the collective." *See id.* at 21. **However, all forms of notice, including any notice issued via text message or LinkedIn must include a statement that Engine denies the allegations.**

The Court agrees with Plaintiff that a 90-day opt-in period is appropriate under these circumstances, with a reminder notice sent after 45 days. A reminder ensures they are given an opportunity to vindicate their rights. *Morris v. MPC Holdings, Inc.*, No. 20-cv-2840-CMA-NYW, 2021 WL 4124506, at *3 (D. Colo. Sept. 9, 2021) (a reminder "will serve the purpose of helping members of the collective exercise their rights").

## VI.  Conclusion

Therefore, upon consideration of Plaintiff's Motion for Court-Authorized Notice Pursuant to Section 216(b) of the Fair Labor Standards Act, ECF No. 52, Defendant's opposition thereto, ECF No. 61, and all other pertinent parts of the record, **IT IS HEREBY ORDERED** that the Motion is **GRANTED**, as follows:

Plaintiff is authorized to issue notice to putative Collective Members who worked as exempt-classified Sales Representatives for Engine in the United States at any time between May 6, 2022 and the present ("putative Collective Members"). "Sales Representatives" are defined as individuals who work or worked as inside salespeople, including in the job titles Account Executive, Account Manager, and Sales Associate, and other similarly situated roles, however variously titled, nationwide.

Within **21 days of this Order**, Engine shall produce to Plaintiff a computer readable data file containing names, last known mailing addresses, last known personal telephone numbers, last known personal email addresses, social media account information for LinkedIn (if known), work locations, and dates of employment as Sales Representatives in each relevant job title and at each location, for all potential Collective Members.

Plaintiff's Proposed Notice and the plan for its distribution are approved, with the modifications described above. In particular, the Notice and Consent to Join Form, in a form substantially similar to the documents found at ECF No. 66-2 (redlined versions of Notice and Consent to Join forms), with **the modifications described above** and with appropriate adjustments for medium, shall issue to putative Collective Members via U.S. Mail, email, and text message within 10 days of the receipt of the data from Engine.

Putative Collective Members will have 90 days from the mailing of the Notice to return Consent to Join Forms (or in the event of re-mailings, 90 days from the re-mailing).

Halfway through the 90-day period, a reminder notice shall issue to putative Collective Members who have not yet returned Consent to Join Forms, via reminder postcard, email, and text message. The information set forth in the Notice shall also be posted on a standalone website, through which putative Collective Members can electronically submit Consent to Join Forms.

Dated this 11th day of February, 2026.

BY THE COURT:

N. Reid Neureiter
United States Magistrate Judge